**BROWN, Administrator Office of Price Administration, v. SOUTHWEST HOTELS, Inc., et al.**

**No. 693.**

District Court, E. D. Arkansas, W. D

April 2, 1943.

Talbot Smith, Regional Atty., Amos Coffman, Regional Enforcement Atty., W. B. Harrell, Regional Litigation Atty., and David B. Love, Enforcement Atty., all of Dallas, Tex., and W. Lee Cazort, Jr., State Atty., Brooks Bradley, State Rent Atty., and John M. Lofton, Jr., State Litigation Atty., all of Little Rock, Ark., for petitioner.

House, Moses & Holmes, and Joseph W. House, all of Little Rock, Ark., for defendants.

TRIMBLE, District Judge.

This is an action brought by the Administrator, Office of Price Administration, against the Southwest Hotels, Inc., and Lamark Company, a corporation, operating the Marion Hotel, in Little Rock, Arkansas. On suggestion of counsel for the defendant that the Lamark Company is no longer a proper party the cause as to it will be dismissed. It also appeared from the evidence that the Southwest Hotels, Inc., hereinafter called the Company, is the operator of three other hotels in the same city, against two of which, the Albert Pike and LaFayette Hotels, like suits have been filed.

Petitioner alleges that in the judgment of the Price Administrator, defendants have engaged in acts and practices which constitute a violation of Section 4(a) of the Emergency Price Control Act of 1942, Pub. L.No.421, 77th Session, C. 26, 50 U.S.C.A. Appendix § 901 et seq., hereinafter called the Act, in that they have violated the provisions of Maximum Rent Regulation 36A, issued pursuant to Section 205(a) of the Act, and that the Price Administrator brings this action to enforce compliance with Section 4(a) of the Act, and with said Maximum Rent Regulation 36A, and alleges that in accordance with the provisions of the Act, Little Rock, along with other territory, was included in the Regulation, which was to become effective August 1, 1942, and sets forth the provisions applying to the Hotel.

There is little or no dispute about the facts in this case, so far as the prices fixed for certain rooms, the prices actually charged, and the other violations set forth

in the petition, the differences between the parties being as to how or why those differences and violations occurred, and the application of the law to the facts.

The Regulation required that hotels should file with the Administration a registration statement showing the maximum rents for each room as follows:

"For a room rented or regularly offered for rent during the 30 days ending on March 1, 1942, the highest rent for each term or number of occupants for which the room was rented during that 30 day period, or, if the room was not rented or was not rented for a particular term or number of occupants during that period, the rent for each term or number of occupants for which it was regularly offered during such period."

This information was to be furnished upon blanks supplied by the Administration, and these blanks were not supplied to the defendant for its four Little Rock hotels until September 15th, 1942, at which time it was advised that an extension of time for filing was granted to October 1, 1942. Thereupon the chief auditor for the Company began assembling information and data from the records of the hotels involved for completing these reports required. He had completed that for the McGehee Hotel, which took him ten days, and then realized he would not be able to complete the other three hotels, including the Marion, within the limits of the time covered by the extension. Also at that time the Company was notified that the Government would take over the Hotel Eastman, at Hot Springs, Arkansas, also operated by the Company, and the chief auditor had to go to Hot Springs and check that hotel over to the government officials. He then delegated the work of completing the report to the Administration to the hotel managers, instructed them to secure this information from the "room rack". This room rack is a rack behind the room clerk's desk on which is listed each room in the hotel, the price for single, double, or multiple occupancy, for daily, weekly or monthly terms. After this information was furnished by the managers, the registration statements for the three remaining Little Rock hotels, the Marion included, was completed by an assistant auditor and filed by him.

It is alleged by the petitioner that in some eight or nine hundred instances there were overcharges made in the price of rooms, between August 1, 1942, and October 15, 1942, the date the Administrator's investigation was closed, ranging in amount from 25¢ to three or four dollars each.

It is the contention of the defendant, and its officers and employees have so testified, that at the effective date of this regulation they did not fully understand the requirements of the regulation; that they believed the purpose of the regulation was to prevent the unjustifiable increase in rentals; that no increase in the rates had been made by the Hotel since October 1, 1941, therefore they were of the opinion this regulation would not in any way affect the Hotel.

They further testified that since the latter part of 1941 the Hotel has been greatly overtaxed. The Hotel is not declared an essential industry, and it has had almost one hundred per cent turn over in its employees since the beginning of 1942, many of its old and efficient employees going into the armed forces. That some department heads were compelled to work two and three days at a time without adequate rest until new and additional help could be employed and, many times, trained. In spite of almost hopeless conditions those in charge and the few remaining trained employees continued in their efforts to perform what they considered their patriotic duty to feed and house soldiers, sailors, and civilians, and particularly those visiting their relatives in the nearby cantonments and defense plants. That it had been the practice of the Hotel for many years during times when the Hotel was taxed to capacity to charge the full capacity rate for rooms; that is to say, if a guest came in and wanted a single room, and only rooms of double capacity were left, he was charged the double rate. This was to enable the Hotel to accommodate more guests. Also, that many times one person would register for a room when the room clerk knew that more than one guest would occupy the room, and he charged the double rate accordingly. That it was the custom, particularly of soldiers on leave, college students, football, basketball and other athletic teams, that one would register for a room, and all who could pile in would actually occupy the room. That this practice of permitting one guest to register for a room when a double occupancy would be had, was continued by the Hotel during August, September and until October 19, 1942, when a regulation of the Administrator came out which required registration of each guest. Thereafter this practice was discontinued

and all occupants of a room required to register.

Defendant's witnesses then detailed the many steps which they have taken, and systems inaugurated to comply, not only with this war time measure, but all other emergency measures, such as food rationing, etc. The general manager for the Hotel testified that since October 1, 1942, he has taken under his personal supervision, and done practically nothing else, except to look after the compliance by the Company with all the governmental requirements and regulations.

Defendant's witnesses have also detailed somewhat at length the difficulty which they experienced in securing adequate help for keeping their records and for compliance with the regulations. They testified that since the effective date of this regulation, and before, they have lost to the armed forces of the country all their young men of able body; that they have had twenty-four room clerks, some of them staying from two days to six months; that for any comparable period before that three room clerks was the most they had to employ, and they stayed with them for years and became expert in the business; that now they have to hire young women who are wholly inexperienced, not only as room clerks but auditors; that ordinarily it would take a man years to become a good room clerk or hotel auditor. They have also testified as to the enormous business done by the Hotel, in spite of the loss of man power in all seventeen departments of the Hotel. That this is the largest hotel in this vicinity, is in the midst of many army training camps, air-fields, schools, bauxite mines, and defense plants. By reason of these things, they say, the hotel is crowded to capacity at all times, and particularly week ends. That these overcharges, assuming they were overcharges, constituted but an infinitesimal percentage of its business in dollars and cents; that an audit made by it showed during the same period over two thousand items of under-charge, and adjustments to guests amounting to $575.

The Administrator seeks an injunction enjoining the defendant, its officers, agents, servants, employees, attorneys and all others acting with them from demanding or receiving any rents for the use and occupancy of any room or rooms in the hotel at rates higher than the maximum rent provided by the Regulation, or doing any other thing in violation of said Regulation, and a mandatory injunction requiring them to file reports, etc.

From all the evidence in the case the Court is of the opinion that the extent of the violations in proportion to the business done by the Hotel constitutes but a very small percentage; that the defendant like all other business concerns doing an extensive business had to learn a great deal about these regulations and the many requirements under the law and regulations, and that they have made an honest and consistent attempt to comply with not only these, but all other regulations. This is borne out by the fact that after October 1, 1942, when this registration statement was filed with the Administrator, and particularly after October 19, 1942, the violations became markedly less frequent. It is further significant that at the McGehee Hotel, where the information was prepared by the chief auditor from the records, no action has been filed against the defendant, and no violations have been shown. It is also significant that for the rooms on the eighth floor of this Hotel, no violations in daily rates have been shown, and it is shown in the evidence that all the rooms on this floor have the same daily rate and hence the chance of error much less.

The court also finds that the defendant took timely, positive, immediate and vigorous action, made a study of the regulations, and inaugurated a system of checks and balances to prevent a recurrence of such violations of the regulations and the law. It set up a capable organization, and as heretofore stated, the general manager has devoted his time to effectuating the methods for compliance.

Undoubtedly the violations occurred, that is, on the face of the record unexplained, for it is undisputed that for some rooms more was charged than was set forth in the registration statement filed by the defendant, but I do not find the conduct of the defendant was such as to charge it with bad faith, wilful misconduct, or with any disloyal motive, intent or purpose. On the other hand, as heretofore stated, the evidence shows that they made a sincere effort to give much needed service under conditions which placed it at a great disadvantage.

The only reported case called to the attention of the Court or which the Court has found after a diligent search, on all

fours with the case at bar, is that of Prentiss Brown, Administrator, v. Hecht Company, 49 F.Supp. 528, decided by Justice Letts, of the District Court of the District of Columbia, on February 19, 1943, and what the court there said applies equally here:

"Certain it is that violations occurred, but I do not find that the defendant company is chargeable with bad faith or of disloyal motive or purpose. It is not charged that the defendant was wilful in its violations and I think it appropriate to say that the element of wilfulness is entirely lacking in the evidence.

"* * * As I view the evidence such violations were the result of errors in interpretating the act and the regulation and applying same to the transactions of the defendant company. Some of the violations may have resulted from negligence or carelessness but I find them innocent in character. No inference of intentional wrong doing may be drawn from them. It may be said to the credit of the defendant company that all errors and mistakes were promptly corrected as soon as they were discovered. It should also be added that the defendant has consistently improved its methods and its records to more fully meet the requirements of the act and regulation and to combat the difficulties which arise from the elements of human frailty."

The defendant company here has taken steps to comply with the law and regulations has inaugurated a system of triple checks to prevent violations, and promptly discover those inadvertently occurring, and has shown all good faith for the future.

But counsel for the petitioner earnestly contend that if it be shown that violations have occurred, the Court is without discretion, and writ of injunction must issue.

This very point was urged in the case of Brown, Administrator v. Hecht, supra, and there the Court said:

"Counsel for plaintiff think the quoted language [Sec. 205(a) of the Act], makes it mandatory for a court to issue an injunction when any violation is shown. Counsel for defendant insist that to so hold would tie the hands of the court, contrary to legislative intent. The legislative history of the act indicates that Congress intended and proposed that the courts shall have jurisdiction to issue whatever order to enforce compliance is proper in the circumstances of each particular case, foreseeing the exercise of full equitable jurisdiction to the end that justice shall be done.

"I am sure that Congress did not anticipate one hundred per cent compliance. The act is a war measure and Congress rightfully expected conscientious and thoughtful cooperation of loyal citizens. Punishment is provided for wilful violations but where violations are not accompanied by the element of wilfulness the Price Administrator may ask and have the powers of the court as an aid in his administration of the act. If in such circumstances an injunction is asked the court is not deprived of its inherent powers by calling it a statutory injunction. The court in such case retains its implied powers, exercised in a sound discretion. Judicial discretion in such case does not mean judicial duty, as the Price Administrator contends. A court of equity may not be divested of jurisdiction by implication. The general equity powers of a court remain unimpaired except where a statute is so rigid as to inhibit the application of equitable doctrines. As generally understood judicial discretion includes the propriety of granting appropriate relief. All rules in equity must necessarily be sufficiently elastic to do justice in the case under consideration. Courts of equity are not inquisitorial but remedial."

The very section of the Act upon which petitioner relies, which provides for the remedy, says: "and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction (or) restraining order, or other order shall be granted without bond." These remedies are set forth in the disjunctive, or the alternative, hence the court, even if some order is mandatory, is given some discretion as to the type of order which shall be entered, and leaves to the court a choice of courses, thus exercising some discretion.

The court is of the opinion that an injunction, restraining order, or mandatory injunction would serve no useful purpose here, and would only be a source of embarrassment to the defendant. The utmost that could be accomplished would be to secure compliance with the regulations to the fullest extent humanly possible, and this the defendant has evidenced its intention to do. Hence no injunction will be granted.

However, the defendant will be directed to file forthwith supplemental registration reports or statements and all such reports as it may be required or proper under the regulation to file, and an order carrying out this directive may be prepared and presented by counsel for the defendant, and, counsel for defendant will also prepare and submit for settlement appropriate findings of fact and conclusions of law.